On the Merits.
It appears from the evidence that, on the morning of August 27, 1913, the car of which plaintiff was conductor was moving in Royal street, in (what, for convenience, we shall call) a southerly direction; that, as it approached the intersection of Frenchman street, the motorman cut off the power and “slowed down,” in accordance with the rules of the railway company which require that precaution when cars are approaching intersecting streets which are paved and upon which, therefore, more traffic is likely to be found than upon streets which are unpaved; that Royal and Frenchman streets are each *778 29 feet wide between tbe curbs; that, upon tbe northeast corner of the two streets there was a “Carnegie Library” building, which was, however, set back a distance of, say, 15 feet from the Royal street banquette and about half that distance from the banquette on Frenchman street, so that, persons in charge of vehicles approaching the intersection from the north and east, respectively, could.see each other, across the. open corner of the lot, while each was not less than 70 or 80 feet from the point of possible collision ; that, when the car reached Frenchman street, the motorman saw a loaded motor truck approaching on that street from the eastward, and, then, 100 or 125 feet distant from the car track, and also saw a prospective passenger standing on the southwest corner, signaling for the ear. He was therefore coasting the car slowly across the street, with no apprehension of a collision. The truck, however, which weighed about 3,500 pounds and was loaded with, say, 3,000 pounds of rice, was approaching at rather a high rate of speed, which the chauffeur appears to have made no effort to check, and the result was that, when the rear end of the ear was about three-fourths of the way across the street, the truck ran into it, striking it near the second window from the rear end, and derailing it, and, then, itself, turning in the direction in which the car was moving, so that, when the two vehicles were stopped, the car was against the west curb of Royal street, on the south side of Frenchman, and the truck was alongside of it, with its front end about even with the front step of the car.
The chauffeur says that he did not see the car until he was within 30 feet of the track, and that he, then, understood the motorman to signal, by moving his head, for him to go on, which he did, and that, when he was within about 6 feet of the track, the motorman started off at full speed. That version of the matter is, however, utterly at variance with the preponderance of the evidence, and finds no support in any circumstance of the case, and we conclude that the collision resulted from the negligence or the inexperience of the chauffeur. Plaintiff, being the conductor, was on the rear platform of the car at the moment of the collision, and was looking to the westward, while the truck was approaching from the eastward. He says that he was thrown against the controller 'and bruised on both sides, and, then, about an hour afterwards, that he “went into a spell” and was taken home, where he remained for about 90 days, suffering, as he says, with nervousness, and drawing “sick relief” from his society.
Taking his testimony with that of the other witnesses, the following facts are established beyond dispute, to wit:
Plaintiff was 31 years old, weighed 140 or 150 pounds, and had enjoyed good health. He had been employed as a- conductor for 8 or 9 years and, perhaps, longer. The cars of which he was in charge had frequently been in collision with other vehicles, sometimes running into them and sometimes being run into; and one ear had “knocked out” a pedestrian in the street. He had never, however, experienced any nervousness on those occasions or afterwards. He felt no nervousness at the time of the accident here in question, but at once found a telephone, and communicated the fact to the proper officials of his company, who within 10 minutes sent a wrecking ear to the scene. He then walked to the barn a distance of three squares, and was assigned to another car, which he boarded and was preparing to take out when he went into the “spell” that he speaks of, and' of which another conductor testifies, as follows:
“I remember one day I got in a Clio car to go home, down at the barn, * * * and Mr. Ragas was sitting down, about to copy the register reading. I spoke to him, and a few seconds, after, he became dizzy and fell in a kind of hys *780 teña, and commenced cutting up and hollering, and toppled over and would have fallen to the floor, only I got hold of him, and I believe somebody else assisted me. * * * ”
After which, the witness says that he escorted plaintiff to his home, where he went ■ to bed and sent for the physician of his society or union, who, being called by plaintiff as a witness, testified in part, as follows:
“I examined him. He complained of pains, but I saw no evidence of the knock or anything. There was no discoloration, or anything. He had pulse between 80 and 90. I told him to keep to bed for the next three days, to see if anything secondary would arise. I called in the meantime, and nothing did show up, and so I left him out four or five days after that. * * * He came to see me * * * two or three times a week [during four to eight weeks]. * * * I told him I thought he was well. I thought he could start back to work. * * * I found nothing, on a physical examination, except that Mr. Ragas told me that he had pains. I went over his chest and all. I found nothing physically the matter with Mr. Ragas Wednesday evening, when I examined him, or thereafter. * * * He was very nervous the first evening that I saw him. * * * Q. When you found this man, Ragas, nervous, as you have described, was that nervousness of such a character as to injure him physically? A. No; I never found any physical disturbances; that is what I say. * * * Q. Now, I ask you, Doctor, could any one suffer from a severe nervous shock that would unfit h,im for his usual vocation, without losing in weight and loss of healthy color and the brightness of his eyes? A. I think there should be some apparent disturbance (which, he says there was not). * * * Q. Doctor, did not you, at one time, say that you thought Ragas was malingering? A. No, sir; I did not say that; I said I thought he was well enough to go to work before he did.”
It appears that the physician whose testimony we have quoted was sent for on one occasion when it was said that plaintiff was having a “spell,” but, being unable to answer the call, another physician was summoned, and he gives the following account of his experience, to wit:
“Mr. Ragas’ wife told me her husband was suffering from paralysis. I went into the house to make an examination, and, after making the examination, found it to be of nervous origin. Mr. Ragas was not in position then, to make a statement as to his condition or pains, or anything else, and, so I instructed his wife that I would call back the next day and make an examination to find out just what was the matter with him. So the next day, when I saw Mr. Ragas, the only thing that he complained of was nervousness then, and a pain in and about his abdomen. I examined, and, really, I could not find any condition that would justify this nervousness outside of, or due to, a nervous shock, from shock received before — I believe, a little prior to my treatment, he had suffered, and, notwithstanding, after that, I instructed him that he was in a position to resume his usual occupation. * * * Q. From your experience as a physician, would that produce a nervous shock of such an extent as he described? A. Not of that length of time. * * * Q. I ask you whether, in your examination of Mr. Ragas, you found at any time a single symptom which would indicate a nervous condition such as he complained of? A. No, sir; nothing that I found on examination that would establish the origin to produce those nervous symptoms. Q. You treated him for nervousness because he complained of nervousness? A. Yes, sir; I treated him for nervousness because he complained of nervousness. * •'* * Q. When you called upon him first, I understand you to have testified that Mr. Ragas’ wife told you he was suffering from paralysis? A. Yes, sir; his wife said he was paralyzed, * * * but at no time did I find any symptoms or signs of paralysis upon examination.”
The physician, thus called, examined him carefully, and found absolutely nothing the matter with him, save an appearance of excitement, or nervousness, for which he was unable, either then or thereafter, to discover any physical cause, and for the existence of which he had nothing but plaintiff’s statement ; and, though he gave plaintiff the benefit of the doubt, to the extent of advising him to keep quiet, in order to find out what might develop, he soon discovered that nothing developed, and advised the patient that he might go to work, which advice the patient did not think proper to accept.
Defendant, also, sent a physician to see plaintiff, and his testimony is to the same' effect; i. e. that plaintiff’s physical condition was perfectly normal, and that he found no symptom indicating that he had received a nervous shock. He further testifies that, at the suggestion of defendant, he informed plaintiff that he was at liberty to consult either of two eminent nerve specialists, here in the city, and that defendant would bear the expense, but that plaintiff replied, “My *782 doctor is a nerve specialist,” and did. not accept the suggestion so made. The witness, like the other physicians, gave plaintiff the benefit of the doubt, but, after repeated visits, found that his own mind was free from doubt.
Opinion.
[3] We find the accident to have been caused by the negligence or incompetence of defendant’s chauffeur, but we have absolutely nothing save plaintiff’s statements to the effect that he afterwards suffered from nervousness, to authorize the conclusion that he was in any wise injured thereby; and his attending physicians, summoned as witnesses in his behalf, as also the physician employed by defendant, concur to the effect that, in accepting his statement, they gave him the benefit of the doubt, though they were unable to find anything in his physical condition to corroborate the statement. We, also, concur in the view that a physician may, within limits, give his patient the benefit of the doubt, and treat him for the ailment of which he complains, but juries and courts of justice are not at liberty to deal with a plaintiff, seeking to mulct a defendant in damages, with that delicate consideration. He must mike out his case with reasonable certainty, and we concur with the jury and the judge a quo in the opinion that the present plaintiff has not carried that burden.
The verdict and judgment appealed from are accordingly affirmed.